Gail Hummel and Helen Hummel v. Commissioner.
Hummel v. Commissioner
Docket No. 3385-69.
United States Tax Court
T.C. Memo 1970-341; 1970 Tax Ct. Memo LEXIS 19; 29 T.C.M. (CCH) 1652; T.C.M. (RIA) 70341; December 16, 1970. Filed *19 William L. Raby, for the petitioners. Dennis C. DeBerry, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent asserted deficiencies in petitioners' income tax for the taxable years 1965, 1966, and 1967 in the amounts of $70,026.74, $9,331.07, and $6,704.46, respectively. Concessions having been made, the sole issue to be decided is whether a sum of money received by Gail Hummel is an amount realized on a sale or the proceeds of a loan. Findings of Fact Some of the facts have been stipulated and are, together with the exhibits attached to the stipulation of facts, incorporated herein by this reference. During the taxable years 1965, 1966, and 1967 petitioners resided in Tucson, Arizona, and filed joint income tax returns for the calendar years with the district director of internal revenue, Phoenix, Arizona. Helen Hummel is a party to this action only by virtue of having filed a joint return, consequently Gail Hummel will hereinafter be referred to as the petitioner. Prior to September 1965 petitioner was the owner of a piece of real estate, and the building situated thereon, located at 3939 North Romero Road, Tucson, Arizona. *20 During this time the property was leased under a 20-year lease to The Coca Cola Bottling Company of Tucson, Inc. 1653 (hereinafter referred to as Coca Cola or the company) and was used as its operation facilities. Coca Cola is a local franchise of the nationwide corporation bearing a similar name and is a closely-held corporation, petitioner owning 61 1/2 percent of the stock, and the other shareholders being petitioner's wife, brother, and a corporation on whose board both he and his brother were directors. Coca Cola paid $3,750 per month in rent to petitioner. Petitioner had a mortgage on the property, the original amount of which was $400,000, which through payments had been reduced to $384,000 by September 1965. He had an adjusted basis in the property of $392,135. The appraised fair market value of the property in September 1965 was $365,000, with an appraised fair rental value of $2,870 per month. Petitioner consummated a sale of his Romero Road property on September 3, 1965. The purchasers, William T. McDonald, John B. McDonald, and Mary K. McAllister took the property subject to the mortgage with an unpaid balance of approximately $384,000 and in addition transferred *21 $250,000 in cash to petitioner. The deed transferring the property was unconditional and contained no provisions for reconveyance. Simultaneously with the above transaction, petitioner, as president of Coca Cola and having been given authority by the board of directors, executed a new lease of the transferred property with Coca Cola as lessee and the McDonalds and mary McAllister as lessors. The new lease was generally the same as the prior one, the difference being that the term was for 25 years (1965-1990) and the rent provisions varied. The new lease contained the following provisions regarding rent: 4. RENT. TENANT shall pay to LANDLORD as BASE RENT during the term of this lease an annual amount equal to eight and one-half percent (8.5%) of LANDLORD's investment, as defined in Paragraph 10 of this document. Said BASE RENT, together with any other payments classified as ADDITIONAL RENT hereunder, shall be payable in equal monthly installments, in advance, commencing on the first day of the first calendar month of the term and continuing throughout the balance of the term, which TENANT agrees to pay. Any installments of BASE RENT or ADDITIONAL RENT overdue for a period of more *22 than ten (10) days shall bear interest at the rate of six percent (6%) per annum until paid. * * * 10. "LANDLORD'S INVESTMENT" DEFINED. "Landlord's investment" shall mean the amount of LANDLORD's investment in the leased premises and shall be the total of the cash cost expended in the acquisition of the leased premises, including, but not limited to, all sums advanced by LANDLORD for the purchase price of the land and any buildings comprising the leased premises at the time of purchase; title searches and insurance of title to the leased premises; surveys; taxes and assessments required to be paid at settlement or paid by LANDLORD prior to settlement and allocable to any portion of the term of this lease; and any other reasonable expenses incident to the acquisition of title to the leased premises. Notwithstanding any provision herein to the contrary, LANDLORD's investment shall not include monies paid as additional rent by the tenant to the Farmers and Bankers Life Insurance Company, under that certain promissory note secured by realty mortgage under these premises. The above provisions resulted in the payment of base rent $1,770.83 per month and additional rent of $2,868 per *23 month representing payments on the outstanding mortgage. [1] Coca Cola also paid to the mortgagor a variable amount per month to cover taxes and insurance which in July, August, and September of 1965 amounted to $1,000 per month. The new landlords required that petitioner personally guarantee all rental payments to be made by Coca Cola, and that he deposit his entire stock holding in that company in an escrow account to secure that guarantee. Further, to insure that the rental payments would be made in the event petitioner, the company's president, should die, the landlords required that a life insurance policy be taken out on petitioner's life payable to Coca Cola and restricting use of the proceeds to the operation of the business. During the year following the two above transactions, petitioner paid over to the company $230,000 of the $25o,000 he had received from the purchasers. The remaining $20,000 was expended by him in satisfaction of obligations created in setting up and finalizing the sale of the property. The total payment of $23,000 was made by several payments of smaller amounts *24 at 1654 times that petitioner in his sole discretion deemed that funds were required by the company. These funds were paid out of an account labeled "Gail Hummel, Trustee Account, 3939 North Romero Road, Tucson, Arizona." At some time prior to December 31, 1967, petitioner sold his entire stock holdings in Coca Cola to a newly formed Coca Cola Bottling Company of Tucson, then a wholly owned subsidiary of the Coca Cola Bottling Company of Albuquerque, New Mexico. Petitioner on his income tax return for 1965 reported no gain from the sale of his real estate. Respondent, determining that the transaction was a sale, found that an unreported capital gain existed and asserted the deficiencies contested herein. Opinion The question before us is unusual in that it involves the reversal of positions by petitioner and respondent in arguing the oft-litigated question of substance over form. Petitioner (the seller of the property) due to exigencies of his business, chose to cast his transaction with the purchasers of the property as a sale. Petitioner now takes the position that though in form the transaction was a sale, it was in actuality not a sale at all but in fact two transactions *25 occurring simultaneously, i.e., the purchase of the property, with the purchase price being the assumption of a mortgage, and a second separate transaction consisting of a loan of $250,000 to the company with petitioner serving as a conduit and repayment of principal and interest ot be made through the payments of inflated rents by the company. While petitioner's view of the transaction is a plausible one, the facts do not support his contentions. Petitioner, rather than the company, received a net amount of $230,000 cash from the purchasers of the property. While this cash was deposited in a bank account that carried the label of a trust account, there is no proof in the record that any trust existed for the benefit of petitioner's company or anyone else. On the contrary, there is ample support for our conclusion that the funds were petitioner's to do with as he pleased. While in fact he paid the entire sum over to the company, he did so at his sole discretion. Had the company's need for funds ceased at any time prior to exhausting the funds, petitioner could have, and we believe would have, employed the funds for other purposes. [2]
*26 Petitioner's entire case is founded on his assertion that the fair market value of the land and building is so much lower than the asserted purchase price as to make the form of the transaction incredible. We disagree. Without intending to discredit the appraisal of petitioner's expert witness, we think that it is inaccurate for the purposes of this case. In making his appraisal petitioner's expert did not take into consideration the extremely favorable lease of the company that was going to accompany the property. We think it obivous that a luctrative long-term lease would have a marked effect on the purchase price of the property. Petitioner asserts that we should not consider the high rent contained in the lease because it too is in excess of the appraised fair rental value and as such must be looked on as something other than rent. Again we must disagree. We think it unlikely that the fair rental value of the property is $2,870 per month as petitioner asserts when he as landlord was receiving $3,750 per month in rent immediately prior to selling the property. While the rent to be paid under the new lease is approximately $4,630, in the absence of further proof by petitioner, *27 we refuse to find that this is not a fair rental value. [3]
Had the $250,000 in cash been transferred to the company and it in turn agreed to pay rent in an amount in excess of fair rental value, our view of the transaction might be different. Likewise, had petitioner received the funds as he did and then, as an individual or sole proprietor, agreed to pay 1655 rent in excess of fair rental value the result might differ. Here, however, the Coca Cola Bottling Company of Tucson, Inc., a separate corporate entity, negotiated a lease favorable to the landlord upon which purchaser *28 relied in agreeing to pay a relatively high purchase price. Under such circumstances we are inclined to view the transaction as the parties did when it occurred, i. e., as a sale. An arm's length business transaction will normally have tax consequences to all parties to the transaction. In the usual case, these parties, as well as respondent, should be able to rely upon the form of the transaction as a primary indication of its substance. [4] Therefore, where one party to a multiparty transaction seeks to upset the form of a transaction so as to diminish his tax liability, this Court requires that he furnish strong proof that what transpired was, in substance, other than what the form indicates. See (C.A. 2, 1959), affirming ; and , on appeal (C.A. 9, Mar. 18, 1969). The form of the instant transaction was clearly a sale of real estate for cash of $250,000 and assumption of a mortgage. Petitioner has attempted to satisfy his difficult burden by contending that the $250,000 payment he received was in reality a loan to his company. Not only is the evidence *29 in the record insufficient to warrant such a conclusion under the strong proof test but would fail under any burden of proof employed by this Court. The form of a transaction is persuasive evidence that the substance of what transpired corresponds with that form. In this case we are not convinced to the contrary and therefore hold that what transpired was a sale. Decision will be entered under Rule 50. Footnotes
1. After February 10, 1984, this latter amount would be reduced to $1,166.67 per month.↩
2. Rather than a loan to the company, as petitioner contends, the transaction very well could be a loan to petitioner and a satisfaction of that loan by his company. The consequences of such a result from a tax standpoint could be burdensome indeed. Petitioner having sold his interest in Coca Cola, the tax picture would be further clouded and we refuse to speculate as to the exact tax consequences.↩
3. Petitioner claims the discrepancy between what he claims as the fair rental value and what was paid by Coca Cola under the new lease is further aggravated by the requirement in the lease that the lessee pay all taxes and insurance. While we have evidence that in some months this amounted to $1,000, petitioner overlooks the fact that as landlord he too required such payments by the lessee and were we to look at this as being in the nature of additional rent prior to selling the property, he would have been receiving $4,750 in rent, an amount far in excess of what he claims is the fair rental value.↩
4. For example, in this case the purchasers of the property, who are neither parties nor witnesses, would suffer a substantial reduction in their basis if the form in which they cast their transaction is ignored.↩